IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Caravan Ingredients, Inc.,

        Plaintiff,

        vs.                             Case No. 13-2592-JTM

AZO, Inc., and Sefar, Inc.,

        Defendants.


MEMORANDUM AND ORDER

Caravan Ingredients, Inc., a bulk flour processor, has brought the present action against AZO Inc. and Sefar, Inc., alleging that a defective metal screen sold and manufactured by defendants contaminated its product. The matter is before the court on Caravan's motion for partial summary judgment, which seeks a determination that the evidence does not support any inference of fault on its part.[1]  For the reasons provided herein, the court hereby grants Caravan's motion.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as

---

[1] Also before the court are AZO's Motion for Extension of Time to File a Surreply (Dkt. 91) and Caravan's Motion in Limine (Dkt. 86). The former seeks leave for a surreply, which AZO argues is warranted because Caravan's Reply to its statement of uncontroverted facts includes evidence from the plaintiff's expert. The court finds no surreply is necessary. As noted below, the expert evidence cited in the Reply is not essential to the court's resolution of the summary judgment motion.

The Motion in Limine seeks to exclude any reference to the termination of one of Caravan's employees as a subsequent remedial measure. Again, the court finds that the summary judgment motion may be resolved on the basis of the uncontroverted facts, and that reference to the employee's termination does not affect this resolution. Caravan's motion in limine may be resolved at a later date.

a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## *Findings of Fact*

On June 27, 1990, AZO sold a Bulk Wheat Flour Sifter manufactured by Sefar to Caravan's predecessor, American Ingredients.

In the Fall of 2011, Caravan decided to add a 30-mesh screen on the Sifter in order

to meet milling standards of the American Institute of Baking. All of Caravan's customers require compliance with AIB standards.

Victor Gutierrez of Caravan contacted AZO Customer Service Representative Cindy Asquino on October 31, 2011, asking for prices and specifications. Asquino, the only AZO employee who ever directly interacted with Caravan, responded by email with specifications for both stainless steel and nylon screens.

In its motion, the plaintiff contends that AZO offered the stainless steel as an option even though it did not believe a stainless steel screen was fit for use, citing the testimony of AZO's Director of Customer Service Michael Nichols.

AZO attempts to controvert this fact, arguing that Nichols "specifically testified that's how he expected a 30-mesh stainless steel screen would fail, but not that the subject 30-mesh stainless steel screen was not a viable option ... or that it was going to fail." (Dkt. 75, at 4).

This denial is not supported in the evidence, which fully supports Caravan's characterization. Nichols testified:

> Q.  *Do you agree with me that a 30-mesh stainless steel screen was not a viable screen for use in the screener?*
>
> A.  *Yes*. We let them know that its not a strong screen.
>
> Q.  But you didn't tell them that it *would fail* in the manner reflected in Exhibit 13 did you?
>
> A.  *No*. They never talked to me. If they would have talked to me.

(Emphasis added).

On October 31, 2011, Asquino wrote to Caravan:

> I am enclosing a capacity charge for your equipment for flour. Note, the nitex nylon is not food grade. Many are under the misconception that stainless screens are stronger, when they are not. Once the metal is fatigued, you run the risk of metal in your product.

At some point the following month, Caravan held a meeting to discuss three options for the screen. Caravan ruled out the nylon screen, because lost portions of the screen

would not be caught by Caravan's metal detection system. In addition, in the event of failure, the white nylon screen would be difficult to detect in the flour. The plaintiff ruled out the 304 stainless steel screen, as this was subject to corrosion. Accordingly, the company chose the 316 stainless steel screen.

On November 7, 2011 Gutierrez emailed Asquino that he was authorized to order the stainless steel screen, and asked if the screen would be made of 400-series stainless steel. She replied the same day that the quote was based on 304-series. She said she would ask about 316-series and 400-series. A few hours later, Asquino confirmed the specifications for the screen, and Gutierrez placed Caravan's order.

The screen was delivered in December, 2011, and the following month a member of Caravan's maintenance staff installed it.

The Screen was first used in production during the first shift in January, 2012, and the flour produced (lot number 1200300503) was later shipped to Canada Bread, one of Caravan's customers.

On February 3, a representative of Canada Bread called Caravan to report that a piece of stainless steel wire mesh was found in the flour. Two days later, Canada Bread emailed a photograph of the wire mesh. On February 6, 2012, Stephen Threatt, Caravan's Director of Maintenance, pulled the screen from the sifter.

Threatt emailed Asquino at AZO and told her of the failure, asking for a response.

Nichols responded, "Steve that is about what I would expect with a stainless steel screen on that mesh."

Caravan recalled all the flour produced on the line from January 9 to February 3, 2012, at a cost of $3,416,901.37.

According to AZO, the screen failed because it was installed incorrectly. The defendant notes that Caravan suspended and eventually terminated its maintenance technician, Gary Dumay, for his failure to perform proper preventative maintenance and

4

inspection of the subject screen. It also argues that Caravan could have discovered the screen failure much earlier if it had conducted the required weekly inspections and maintenance.

Caravan was also aware of the potential fatigue to the stainless steel screen, and therefore increased its inspection of the screens to weekly so that Caravan "could really contain any possible contamination in a very short period of time."

AZO cites the deposition testimony of Ronnie Gomez, Caravan's operations and plant manager. Gomez testified that Caravan knew the stainless steel screen might fail. The company increased its inspections so that it "could really contain any possible contamination in a very short period of time."

Yordanska Mitjans, a quality control supervisor at Caravan, testified that the Caravan management team assumed its system would detect any piece of metal, regardless of its consistency, if it was larger than 3.5 millimeters. Mitjans had supervised testing of the system in 2011, but this had not included a determination as to whether metal mesh screen pieces could be detected.

Caravan performed no testing of its metal detecting system on a metal screen prior to choosing the new screen sold by AZO. After the report by Canada Bread, Caravan conducted additional testing, and found that such failures were not detectable.

The subject screener operating manual states "screen sleeves should be inspected each week or sooner if the unit performance is reduced." The 1994 manual provided that "[i]n normal operation, the screening cloth should be checked weekly, or whenever the screening performance is inadequate."

Before the failure of the screen, Caravan had implemented its own weekly Preventative Maintenance (PM) work orders assigned to all of its bulk sifter machines and metal detection systems, and, according to Gomez, had increased screen inspections from monthly to weekly so that Caravan "could really contain any possible contamination in a

very short period of time."

On February 6, 2012, after the report from Canada Bread, Threatt and other Caravan technicians inspected the screen. Threatt could see that the screen "had been compromised" and had multiple holes in it.

Caravan had begun Weekly Preventative Maintenance (PM) work orders on January 9, 16, 23, and 30. In each PM, Caravan's maintenance technician Gary Dumay indicated he had inspected both the screen and the metal detection system and had found no problems.

Dumay worked for Caravan from 2007 to 2012. Dumay was not given any maintenance or parts manuals for the screener machine, but another worker showed him how to conduct inspections. He was first asked to perform an inspection of the subject metal screen on January 9, 2012. No one accompanied him on his inspections, or showed him how to perform such an inspection before that time.

Threatt was suspicious about whether Dumay had properly performed the required PM work order inspections, and confronted him. Dumay said that he had performed the visual inspections of the screen. Dumay was later suspended and fired for improperly inspecting the subject screen.

### Conclusions of Law

Caravan first argues that its fault in the selection of the screen cannot be compared because fault requires a duty. *See Akins v. Hamblin*, 237 Kan. 742, 749, 701 P.2d 771, 776 (1985) (fault requires existence of duty); *Wooderson v. Ortho Pharmaceutical*, 235 Kan. 387, 681 P.2d 1038, 1058 (1984) (party claiming comparative fault has burden to prove fault). The exact extent of Caravan's requested relief, however, is unclear. According to plaintiff, the claim that it was at fault for choosing a metal screen cannot be compared because it had no duty under the facts of the case:

> AZO never communicated to Caravan that the stainless steel option was not viable. Caravan had no affirmative duty to determine whether the Caravan

6

[sic] was presenting it with an non-viable option. Additionally, if the stainless steel screen AZO offered to, and did sell to Caravan was unfit for its intended purpose, then it should not have been offered in the first place. AZO knew of the unsuitability of the product, and nonetheless sold the stainless steel screen to Caravan knowing that it would fail.

In its Response, AZO lays great emphasis on the "warning" email of October 31, 2011. But the email contains no direct warning of danger. As to the screen choices, the email states only that a nylon screen "is not food grade" — thereby further steering Caravan towards a choice of one of the stainless steel screens. As to such screens, the email is clearly equivocal, stating that such screens are not stronger than nylon screens, and that "[o]nce the metal is fatigued, you *run the risk* of metal in your product." The email thus indicated to Caravan that, after a time, there was a chance of failure. From Nichols's testimony, however, AZO knew that the metal screen was not viable, and was certain to fail.[2]

Nichols's deposition testimony clearly demonstrates that AZO knew the screen was going to fail. In addition to the deposition passage cited earlier, Nichols further testified that when Asquino told him Caravan was interested in a stainless steel screen, "I said it's not going to work." However, Nichols only said this to Asquino, and Nichols admitted that Asquino's subsequent email to Caravan did not relay this information to Caravan.

Nichols claimed that AZO offered the stainless steel screen "[b]ecause of the customer's insistence," but Nichols was never directly a party to any communication with Caravan. Nichols otherwise admits that all he knew was what he heard from Asquino, and "[a]ll she relayed to me was that they wanted to buy a 30-mesh screen." There is no evidence Caravan insisted on a metal screen.

More importantly, the evidence is uncontroverted that AZO knew a metal screen would fail. Asked if "it's your opinion and it is AZO's opinion that 30-mesh stainless steel

---

[2] Caravan has also supplied expert testimony that Asquino's statements regarding screen strength were misleading, because the key factor in avoiding screen failure is not strength but elasticity, and that as a result, the nylon screen was the only proper choice. However, since this evidence was presented only in the plaintiff's Reply, it plays no role in the court's opinion.

screen should not have been used in this screener?" Nichols responded, "Yes." After the accident, Nichols responded to Threatt that he expected such a failure:

Q.  What do mean by that?

A.  That is what I would expect, how that screen would come apart with that size wire.

Q.  Meaning that you would expect a 30-mesh stainless steel screen to –

A.  To fail like that.

Q.  To fail in the manner shown in Exhibit 13?

A.  Absolutely.

The court finds that the purported "warning" in the October 31, 2011 email fails to adequately convey AZO's certain knowledge that the stainless steel mesh screen was not a viable option, because the screen would fail. Because of this certainty of failure, the screen was not fit for its intended purpose, and there is no basis for comparing Caravan's fault in the selection of the screen.

As Caravan notes, much of AZO's response is given over to the contention that Caravan was at fault in correctly operating or inspecting the sifting machine after the new screen was installed. But Caravan's motion does not address such allegations of fault, and Caravan in its Reply expressly "takes no position on whether the facts surrounding the weekly inspections support a hypothesis of comparative fault." (Dkt. 85, at 26). Rather, Caravan's motion is centered on the absence of evidence that it was at fault in the selection of the stainless steel screen. Given the uncontroverted evidence, the court agrees, and grants plaintiff's motion.

Finally, Caravan's motion also seeks dismissal of the AZO's argument (advanced in its Comparative Fault Identification ¶ 1.A.9) that Caravan's claims "are barred by the 'learned intermediary' or 'sophisticated user' doctrine." As Caravan points out, the doctrine has only limited application under Kansas law, since the doctrine simply recognizes that "drug manufacturers are not liable for failure to directly warn patients of

risks and side effects." *Humes v. Clinton*, 246 Kan. 590, 792 P.2d 1032, (1990)  The doctrine has thus been found to be inapplicable where the plaintiff doe not advance a failure-to-warn claim, or the claim relates to some product other than prescription medications and medical devices. *See Corr v. Terex USA, LLC*, No. 08-1285-MLB, 2011 WL 1097775, *3 (D. Kan. 20111) (recognizing limited scope of learned intermediary doctrine). AZO's Response is silent on the issue, and the court grants summary judgment on this claim of comparative fault.

IT IS ACCORDINGLY ORDERED this 16th day of December, 2014, that the plaintiff's Motion for Partial Summary Judgment (Dkt. 64) is hereby granted; defendant's Motion for Extension (Dkt. 91) is hereby denied.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

9