IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Caravan Ingredients, Inc.,

               Plaintiff,

          vs.                         Case No. 13-2592-JTM

AZO, Inc., and Sefar, Inc.,

               Defendants.

MEMORANDUM AND ORDER

      This matter is before the court on several motions, including a Motion in Limine (Dkt. 86), a Motion for Summary Judgment (Dkt. 104), and a Motion for Reconsideration (Dkt. 99). The latter addresses the court's ruling (Dkt. 93) which concluded that defendant AZO, Inc. had failed to fully convey to plaintiff Caravan Ingredients the extent of its knowledge as to the viability of a metal screen for use in Caravan's flour milling production. The court granted Caravan's motion for partial summary judgment. Caravan then filed its motion for summary judgment (Dkt. 104), essentially arguing that the earlier decision effectively resolves the case. The general background of the case, and the relevant summary judgment standards, have been set forth in the court's earlier rulings, and need not be repeated here.

      The court notes that the parties have recently commenced an additional round of

summary judgment motions. Caravan seeks summary judgment as to the amount of damages (Dkt. 122) and seeks to strike Paragraph 2 of AZO's Comparative Fault Identification, which alleges that the accident was caused by the screen frame. (Dkt. 124). AZO has moved for summary judgment on Caravan's claims of strict liability, negligence, and breach of contract. (Dkt. 126). Finally, Caravan has moved to strike AZO's expert, Philip Buckley. These motions remain at issue before the court. However, to clarify issues in the action and permit more efficient briefing and resolution of the subsequent motions, the court enters this present order to address those matters which have been fully briefed.[1]

### Findings of Fact

On June 27, 1990, AZO sold the the machine sifter to Caravan's predecessor. Accompanying the sifter was an Operating Instructions/Spare Parts List which stated that AZO stocked replacement screens, either nylon or steel.

In the Fall of 2011, Caravan decided to add a 30-mesh screen on the sifter in order to meet milling standards of the American Institute of Baking

Victor Gutierrez of Caravan contacted AZO Customer Service Representative Cindy Asquino on October 31, 2011, asking for pricing and specifications for a 30-mesh stainless

---

[1] In addition to these motions, AZO has also moved (Dkt. 118) to strike plaintiff's reply in support of its motion for summary judgment, on the grounds that Caravan inappropriately first raised the issue of Buckley's expertise in its reply. The court typically excludes from its analysis arguments raised for the first time in reply, *Wagher v. Guy's Foods, Inc.*, 765 F.Supp. 667 (D. Kan., 1991), and the motion to strike is denied as moot. The admissibility of Buckley's testimony will be determined by Caravan's recent *Daubert* motion.

steel screen. Asquino was the only AZO employee who directly interacted with Caravan. Gutierrez said the screen would be used in an AZO E 650 screener. Asquino emailed specifications for both stainless steel and nylon screens.

Michael Nichols, AZO's Director of Customer Service, was designated as AZO's Rule 30(b)(6) corporate representative for the following topics:

1. Any and all communications between AZO and Caravan related to the selection of the failed 30-mesh screen at issue in this litigation;
. . . .
3. The specifications for the 30-mesh screen at issue in this litigation;
. . . .
5. The method of assembling and installing the failed 30-mesh screen at issue in this litigation;
6. The content of any operator manuals, or other documents issued by AZO for the E-650 cyclone screener involved in this litigation, including the Operating & Maintenance Instructions editions from October 199.4 (see deposition Exhibit 16) and June 16, 2000 (see deposition Exhibit 17), as well as the Operating Instructions/Spare Parts list marked as deposition Exhibit 19.

Caravan's motion rests on Nichols' deposition. During the course of this testimony, Caravan argues that Nichols essentially admitted that the defendant knew the screen was not a viable option, but that it sold the screen to without communicating this fact to the plaintiff.

According to Asquino, Gutierrez originally "wanted a metal screen," and after further discussion "they insisted" on it. The evidence does not show that this "insistence" was contemporaneously conveyed to Nichols, who admitted that "[a]*ll she related to me* was that they *wanted* to buy a 30-mesh [metal] screen." (Emphasis added).

AZO responds by claiming that Nichols "did not use the specific words 'not a viable

option.'" (Dkt. 108, at 6). It further notes Asquino's October 31, 2001 email which cautioned against the "misconception that stainless screens are stronger" than nylon screens, and that "[o]nce the metal is fatigued, you run the risk of metal in your product." Asquino further testified that she told Gutierrez that "we do not recommend stainless steel screens in that mesh." Finally, Nichols testified "we let them know it's not a strong screen."

The court finds that AZO failed to fully inform Caravan that the screen was not viable. While Gutierrez may have alerted Caravan to the fact that stainless steel is not stronger than nylon, and the "risk" of fatigue and failure, she did not fully inform Caravan of the extent of the defendant's knowledge. Nichols testified that he knew the metal screen was "not going to work." He agreed that he "knew [the screen] was not sufficient." After the learning of the failure of the screen, he testified that "[t]hat is would I would expect," that is "how it is going to fail." He explicitly agreed with the proposition that the metal screen "was not a viable option." In sum, AZO knew failure of the metal screen was *certain* ("it is going to fail"), but it told Caravan only that such failure was *possible* ("you run the risk" of failure).

It is uncontroverted that Asquino's "risk" of failure email does not accurately convey AZO's express disclaimer as to the use of metal screens. That written disclaimer is much stronger, stating:

> Please note that AZO, Inc. does ***not*** recommend using the Stainless Steel Screens over 10 mesh size. We will sell this Stainless Steel Screen with no refund or warranty against damage to your equipment or product loss.

(Emphasis in original).

4

On November 7, 2011, Gutierrez emailed Asquino that he was authorized to order the stainless steel screen, and asked if the screen would be made of 400-series stainless steel. Asquino replied the same day that the quote was based on 304-series. She said she would ask about 316-series and 400-series.

On November 17, 2 011, Asquino confirmed the specifications for the screen, and Gutierrez placed Caravan's order.

Tony Gionti, AZO's Purchasing Manager, was designated as AZO's Rule 30(b)(6) corporate representative for the following topics:

> 2.     Any and all communications between AZO and Sefar related to the failed 30-mesh screen at issue in this litigation;
>
> . . . .
>
> 14.    The chain of custody for the subject 30-mesh screen between AZO's purchase and shipment to Caravan;
>
> 15.    Any testing, verification or product modification by AZO after receiving the screen from Sefar before shipping to Caravan.

Gionti admitted that AZO received the screen shipped to it by Sefar. AZO visually verified that the screen matched the specifications quoted by AZO, and, without doing any testing or more detailed verification, repackaged the screen for shipment to Caravan. This process took place within one day's time.

The screen was delivered to Caravan in December 2011, and the following month, a member of Caravan's maintenance staff installed it. The screen was first used in production in January of 2012, producing lot number 1200300503 on the Bulk Wheat Flour

Line.

On February 3, 2012, a representative of Canada Bread called Caravan to report that a piece of stainless steel wire mesh was found in the flour. Two days later, Canada Bread emailed a photograph of the wire mesh.

On February 6 or 7, 2012, Stephen Threatt, Caravan's Director of Maintenance, removed the screen from the sifter. He emailed Asquino and told her of the failure.

On February 13, 2012, Nichols responded to Threatt, "Steve that is about what I would expect with a stainless steel screen on that mesh."

Caravan recalled all product produced on the Bulk Wheat Flour Line from January 9, 2012 through February 3, 2012. The recall cost $3,416,901.37.

The screens used in the machines require maintenance and periodic replacement. The steel in the screens was manufactured by Sefar, which made the six screens for the AZO E-650 screener and sent them to Caravan.

In her October 31 email, Asquino included a Wheat Flour Capacity Chart, indicating that the flow rate of wheat flour through the E-650 screener for a 30-mesh screen should be no more than 16,000 pounds per hour.

AZO's response relies in part on the report of plaintiff's retained expert Thomas W. Eagar, Ph.D.  In particular, in paragraph 3 of his report, Dr. Eagar indicating that the "higher and highly non-uniform wire strength in the CA20 and CA21 wire supplied by Sefar is the most probable cause of the rapid failure of the upper broken mesh." Dr. Eagar agreed that when AZO received the screens from Sefar, that there was no way it could

know of the non-uniform wire strength

AZO also relies on its own expert, Stephen Buckley, P.E., who believes the screen broke when it was overloaded by Caravan within the first few days it was put into use, because it was operated at a flow rate of 18,000 pounds of wheat flour per hour. He also believes that Caravan should have better investigated improvements in its metal detection system before using the wire mesh; that AZO management gave reasonable notice to Caravan of "the potential for the problem to occur, before they made their purchase decision."

Caravan responds by stressing that Buckley is not a expert in metallurgy, change management process, or the science of human factors. He expressly testified he has no data to support his estimate of the actual wheat flow.

In November 2011, Caravan held a meeting to discuss the three potential screen options provided by AZO. Caravan employees decided that the 316 stainless steel option would be detected by Caravan's metal detection system if it ever was compromised.

Ronnie Gomes was Caravan's Plant Manager, and was at the meeting. He testified that Caravan was aware of the potential fatigue to the stainless steel option, and therefore increased the inspection to weekly so that Caravan "could really contain any possible contamination in a very short period of time."

AZO further states that Gomes testified that the flow rate through the screener was 300 pounds per minute, 3,000 pounds per 10 minutes. According to AZO, this "equat[es] to 18,000 pounds per hour."

Gomes's testimony, however, is not clear. He testified that Caravan was looking for its hopper, downstream from the screener, to carry 3000 pounds every ten minutes. He continued:

> So we knew we had three systems that fed off of that line so we knew that the flow rate that we needed was at least 9,000 pounds an hour. And the chart, from my recollection that we were provided with from Azo for U.S. mesh size 30, that's 16,000 pounds would be flowing through that screen for an hour, which was adequate for us.

Gomes continued, stating that he did not know the actual flow rate setting for the screeners in January 2012.

In its Reply, Caravan cites evidence indicating that the actual flow rate for the line did not exceed 16,000 pounds per hour.

The screener's Maintenance and Operating Instructions Manual states: "The screen sleeves should be inspected each week or sooner if the unit performance is reduced."

Yordanska Mitjans was hired by Caravan in early 2008 as a quality control manager and eventually promoted to quality control supervisor six months later. Her job duties for Caravan included overseeing all quality operations, quality control, food safety and security, and any other aspects that would affect the quality and safety of their products. It was the responsibility of the entire Caravan management team to ensure the metal detecting systems were working properly.

Caravan assumed that its metal detection system would detect any piece of metal, regardless of its consistency, if it was larger than 3.5 millimeters. Caravan's quality control department conducted its own testing of the metal detecting systems in 2011, but this

testing did not include pieces of mesh screens.

Caravan eventually conducted a metal detection system test on the piece of metal screen that was returned to it by Canada Bread and at that time "realized it wasn't detectable." After that metal screen piece was determined to be undetectable, Caravan conducted further tests with larger pieces of the same subject metal mesh screen.

No testing of the subject metal screen had been done with the metal detection system prior to the subject metal screen's installation.

Caravan implemented its own weekly Preventative Maintenance (PM) work orders assigned to all of their bulk sifter machines and metal detection systems. Stephen Threatt served as the Total Productivity Maintenance (TPM) coordinator from August 2007 to February 2011 at the Caravan plant, and Gary Dumay was one of eight maintenance technicians.

Threatt relied on a 1994 E650 manual stating that the screening cloth should be checked "weekly, or whenever the screening performance is inadequate."

Caravan issued PM work orders during the weeks of January 9th, January 16th, January 23rd, and January 30th of 2012. According to the PM for January 9th, Dumay indicated that he had inspected both the subject stainless steel screen and its metal detection system on January 9, 2012 at 10:45 a.m., and had found no problems with either. The work orders for January 16th, January 24th, and January 30th indicated Dumay inspected both the subject stainless steel screen and its metal detection system, and had found no problems.

Dumay testified that he was never given any training with respect to how to maintain, install or inspect the subject screen, and was never given any instruction, maintenance or parts manuals for the E650 screener. He was first asked to perform an inspection of the subject metal screen on January 9, 2012. It is uncontroverted that no one from Caravan accompanied Dumay on any of his metal screen inspections.

Caravan contends that "a senior co-worker explained to [Dumay] how to inspect the Screen." (Dkt. 114, at 22). In the cited passage in his deposition, Dumay testified that at the time of his first inspection, on January 9, 2012,

> there was no training. There was no real process nor was it safe to do any type of inspection. So I asked Lester Sullins [a senior mechanic at Caravan] what would be the way to do that since he had been there for over 30 years, and he said just go up and open it up and look inside.

After the report from Canada Bread, Caravan held a production meeting. Shortly thereafter, Threatt and another maintenance technician inspected the steel screen and found that it "had been compromised" and had multiple holes in it.

Threatt suspected that Dumay had not actually inspected the screens. He suspended Dumay, and later terminated him.

### A. Motion in Limine

After Threatt inspected the sifter and found holes in the screen, he confronted Dumay. Dumay said that he had visually inspected the screens. Dumay was suspended, and told to return the following week. When he returned, Threatt terminated his

employment.

Caravan has moved (Dkt. 86) to exclude reference to Dumay's suspension and termination pursuant to Fed.R.Evid. 407, as evidence of a subsequent remedial measure. Rule of 407 has been interpreted to include employee discipline imposed as the result of an accident investigation. *See Hull v. Chevron*, 812 F.2d 584, 586-87 (10th Cir. 1987).

AZO opposes the motion. First, it argues that the motion should be denied because it is "inconsistent" for Caravan to argue "that there are no material facts demonstrating its fault, then seek the protection of F.R.E. 407." (Dkt. 94, at 3). AZO cites no authority for the proposition that a plaintiff may not invoke the protection of Rule 407. The Tenth Circuit has expressly concluded that the post-accident termination of an employee is excludable as a subsequent remedial measure under Rule 407. *See Hull*, 812 F.2d at 586–87. Caravan relies on *Hull* as a central basis for its motion in limine, AZO ignores the decision.

Second, AZO argues that the evidence is admissible because it does not implicate the policy rationale behind Rule 407. The Rule is predicated on "a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." *Sealer v. Burlington Northern Santa Fe Corp.*, 102 F.Supp.2d 1226, 1245 (D. Kan. 2000). More specifically, AZO relies on *Rimkus v. Northwest Colorado Ski Corp.*, 706 F.2d 1060, 1066 (10th Cir. 1983), where the court observed, as to evidence which might be otherwise subject to Rule 407, "[w]here it relates to the alleged contributory negligence of plaintiff it should not be considered prejudicial."

This reads *Rimkus* far too broadly. In that case, the court simply held that it was not

11

reversible error for the court to have allowed evidence that, the day after a skiing accident, the defendant posted bamboo poles to mark a rock outcropping, which the defendant claimed was "an obvious, readily seen condition." 706 F.2d at 1065. The court stressed that the district court "was very cautious about the evidence," and explicitly noted that the challenged evidence was admitted following a strong cautionary instruction that the evidence was to be considered "only as to the feasibility of marking the area," an instruction which "certainly nullified any tendency that the jury could treat this as an acknowledgment on the part of the defendant-appellant that it recognized that there was an unreasonable hazard present." *Id.* Further, the court noted the sequence in which the evidence was offered. The defendant ski lodge itself "opened the question" of feasibility by providing presenting evidence from a ski instructor that 'it had never crossed his mind' that the plaintiff would have been unable to see and avoid the condition." *Id.*

The court also stressed the essentially defense use of the evidence — that it was essentially not used to prove the other party's fault, but was presented to rebut a claim of fault by the proponent of the evidence. Thus, the evidence of the bamboo poles

> was received not for the purpose of proving the negligence of the defendant, but rather was for the purpose of showing that the plaintiff was not guilty of contributory negligence. The challenged evidence also was admitted for the purpose of undermining the testimony of the witness Oakland that he could see the outcropping for a couple hundred feet.

*Id.*

Most importantly,  the court stressed that the evidence could well have been excluded, and found that under the circumstances of the case its admission was not

12

reversible error:

> The trial court might well have chosen to exclude the evidence. The judge was fully aware of the problem. He weighed the countervailing contentions with care. He made it plain that it was to be considered only with respect to other issues besides the possible negligence of the defendant.

706 F.2d at 1066.

Here, there is no allegation that it was not feasible to conduct weekly inspections of the screener. The evidence of Dumay's termination is offered offensively, precisely for the purpose of showing that Caravan was at fault because its employee failed to follow through with his assignment. AZO offers that evidence not to rebut an allegation of contributory negligence by plaintiff (as in *Rimkus*), but in support of its own claim that Caravan contributed to the screen failure.

Third, AZO argues that the evidence is admissible to show that Caravan accepted a duty to inspect the screen. The court finds the evidence is not probative and should be excluded. AZO is free to show — by other, admissible evidence — that Caravan had a legal duty to AZO to inspect the screen. The termination of Dumay, however, only shows Caravan's interpretation of Dumay's duty to it, not its duty to AZO. In any event, the termination directly implicates the policy underlying Rule 407, and is properly excluded as on that basis and as unfairly prejudicial to Caravan.

AZO next argues the termination is permissible for impeachment purposes against both Caravan and Dumay. (Dkt. 94, at 7). That is, according to the defendant, evidence of the termination is probative to counteract "the implication that Caravan believed Mr.

13

Dumay's story," and further "admissible to impeach Mr. Dumay's sworn testimony that he inspected the screens" because it shows "that his employed [sic] found his story either implausible or untrue." (*Id.*)

The court finds the evidence is not admissible on the grounds cited. In both cases, AZO's argument turns on Caravan's private *belief*, which may be nothing more than an after-the-fact, abundance-of-cause decision to release an at-will employee. In both cases, the cited rationale for admissibility runs directly counter to the prohibition of Rule 407.

AZO argues that the termination is an admission of a party opponent. In support of its argument, AZO cites only *Quaney v. Tobyne*, 236 Kan. 201, 689 P.2d 844 (1984). That case, which involved an oral contract for the sale of cattle, merely held that certain conduct may effectively admit the existence of the contract and thus negate a statute of frauds defense under the state Uniform Commercial Code, K.S.A. 84-20-201(3). The case involved no subsequent remedial measures, and thus does not implicate, or somehow excuse the application of, Rule 407.

Finally, AZO argues that Dumay's termination is admissible to prove causation. AZO stresses that "F.R.E. does not prevent evidence for the purpose of showing causation." As with its contentions as to duty and causation, however, AZO is unable to make this argument without bringing in Caravan's (supposed) subjective judgment as to its employee. Thus, it argues that the termination is relevant because it "demonstrates that Caravan believed Mr. Dumay was responsible for allowing the screen to remain in production." (Dkt. 94, at 9).

14

Again, AZO is entitled to show that Caravan's conduct helped caused the screen failure. But it may not do so by evidence integrally connected to a post-accident investigation. Such employee discipline reflects practical and prudential considerations, and directly implicates the policy rationale for Rule 407.

### B. Summary Judgment

In the present motion for summary judgment, Caravan seeks summary judgment on its claims of (1) strict liability, (2) negligence in breaching a warranty of fitness for a particular purpose and for failure to warn, and (3) breach of contract. In each case, Caravan's argument is cursory. Its motion rests entirely on the court's determination in its prior Order that AZO failed to fully reveal to Caravan the danger of using the stainless steel mesh screen. This screen was essentially certain to fail, and thus was not fit for use in the AZO E 650 flour screener.

The court notes that plaintiff's earlier motion, and the court's Order, explicitly did not address any allegation of fault by Caravan "in correctly operating or inspecting the sifting machine after the new screen was installed." (Dkt. 93, at 8). The Order only determined that Caravan's fault could not be compared as to the original selection of the metal screen over a nylon screen. Caravan's original motion was explicitly narrow in scope, and the court's Order was correspondingly limited. Caravan by its present motion attempts to leverage this determination into an effective resolution of the entire action. The court will deny the motion for summary judgment.

With respect to the plaintiff's strict liability claim, the plaintiff has presented no evidence that the stainless steel screen was "unreasonably dangerous," as that term is defined under Kansas law. *See Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348 (1983). Although the plaintiff's memorandum in support of its summary judgment motion (Dkt. 104, at 8) acknowledges this element of its claim, it does nothing to explain how the screen was indeed unreasonably dangerous. Rather, it simply repeats the determination of the court that the screen was not fit, coupled with a citation to its own State of Fact ¶ 13 — neither of which mention or state that the screen was defective or unreasonably dangerous.

Against this, the defendant has supplied some evidence indicating that the screen may have failed due to a manufacturing defect by co-defendant Sefar, or potentially due to overproduction by Caravan. At this stage in the litigation, the court does not weigh or balance such evidence. Because a fact question exists as to the actual cause of the screen failure, summary judgment is denied.

The same is true as to Caravan's request for summary judgment as to its claim for negligence, whether couched in terms of violation of the Kansas Products Liability Act, or as a failure to warn. There is evidence that the screen may have failed due to a manufacturing defect, or by the fault of the plaintiff, whether through overproduction, failure to properly maintain the screen, or failure to properly test its theory that metal detectors could prevent product contamination.

The claim of negligence for failure to warn is subject to the same problems, coupled with an additional defect:  plaintiff has not alleged AZO was at fault for a failure to warn.

In its earlier decision, the court wrote that Caravan has "not raised claim for failure to warn." (Dkt. 93, at 9). Moreover, the Pretrial Order, filed after the court's ruling on Caravan's first motion for summary judgment, mentions "warnings" only in the *defendant's* allegations in support of its affirmative defense that the plaintiff failed to heed its notice about the danger of failure of a metal screen. (Dkt. 117, at 12, 16, 17-18). The plaintiff makes no mention of any failure to warn.

And the court reaches the same conclusion with respect to Caravan's claim of breach of contract. The defendant supplied the screens which were contracted for. Beyond this, plaintiff's claim for breach of contract requires that the trier of fact determine any breach by AZO, and to what extent that breached caused damages to Caravan.

The court's Order was narrow — Caravan's fault cannot be compared as to the original "*selection* of the [metal] screen." (Dkt. 93, at 6) (emphasis added). This conclusion remains true in light of Nichols' admissions as to the viability of the screen, and the failure of Asquino's October 31 email to fully convey the extent to this knowledge.

Nevertheless, the email does raise a potential red flag which a cautious purchaser might have considered important. That is, the email might be relevant to whether Caravan was at fault in failing to test is metal detection system, given Asquino's statement that metal screens are in fact weaker than nylon, and more prone to failure. It may be relevant in determining whether Caravan failed to maintain the screener with proper diligence, again given the warning of potential failure. Finally, the email may be relevant in determining whether Caravan was at fault for overtaxing a metal screen by heavy

17

production, even though it knew such screens are weaker than nylon.

C. *Reconsideration*

A motion to reconsider may be granted to correct manifest errors, or in light of newly discovered evidence; such a motion is directed not at initial consideration but reconsideration, and is appropriate only if the court has obviously misapprehended a party's position, the facts, or applicable law, the court has mistakenly decided issues not presented for determination, or the moving party produces new evidence which it could not have obtained through the exercise of due diligence. *Anderson v. United Auto Workers*, 738 F.Supp. 441, 442 (D. Kan. 1989). A motion to reconsider is not "a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. GMC*, 846 F.Supp. 1482 (D.Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994). The resolution of the motion is committed to the sound discretion of the court. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

Here, AZO's motion is simply reargument of matters previously addressed in the summary judgment pleadings, with one exception. AZO correctly notes that the court erred in citing the October 31, 2011 email as stating that the nylon screen "is not food grade," when in fact the original email stated that the nylon "is food grade."

However, this determination was not essential to the court's ruling. The court stressed that the "warning" email "contains no direct warning of danger." (Dkt. 93, at 7).

18

As to the choice of metal screens, the court found,

> the email is clearly equivocal, stating that such screens are not stronger than
> nylon screens, and that "[o]nce the metal is fatigued, you *run the risk* of metal
> in your product." The email thus indicated to Caravan that, after a time,
> there was a chance of failure. From Nichols's testimony, however, AZO knew
> that the metal screen was not viable, and was certain to fail.
>
> Nichols's deposition testimony clearly demonstrates that AZO knew
> the screen was going to fail. In addition to the deposition passage cited
> earlier, Nichols further testified that when Asquino told him Caravan was
> interested in a stainless steel screen, "I said it's not going to work." However,
> Nichols only said this to Asquino, and Nichols admitted that Asquino's
> subsequent email to Caravan did not relay this information to Caravan.....
>
> More importantly, the evidence is uncontroverted that AZO knew a
> metal screen would fail. Asked if "it's your opinion and it is AZO's opinion
> that 30-mesh stainless steel screen should not have been used in this
> screener?" Nichols responded, "Yes." ....
>
> The court finds that the purported "warning" in the October 31, 2011
> email fails to adequately convey AZO's certain knowledge that the stainless
> steel mesh screen was not a viable option....

Nothing cited in the Motion for Reconsideration justifies any change in this result.

AZO knew the metal screen was "not going to work," it "expected" the screen to fail as it

did, "[a]bsolutely." Yet AZO notified Caravan only that there was a chance of failure.

The email failed to fully convey AZO's knowledge, and the motion for

reconsideration is denied. However, as noted earlier and at least in light of the motions

which are presently ripe for resolution, the court does not find that this determination is

dispositive of the case.

IT IS ACCORDINGLY ORDERED this 20th day of March, 2015, that the Plaintiff's Motion in Limine (Dkt. 86) is granted; defendant's Motion for Reconsideration (Dkt. 99) is denied; plaintiff's Motion for Summary Judgment (Dkt. 104) is denied; and defendant's Motion to Strike (Dkt. 118) is denied as moot.


<u>s/ J. Thomas Marten</u>
J. THOMAS MARTEN, JUDGE