IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Caravan Ingredients, Inc.,

    Plaintiff,

vs.                        Case No. 13-2592-JTM

AZO, Inc.,

    Defendant.

MEMORANDUM AND ORDER

By the present Order the court addresses what is essentially the third wave of motions in this action by Caravan Ingredients, Inc. alleging that a defective screen manufactured by former defendant Sefar, Inc. and sold by defendant AZO, Inc. caused contamination of flour produced by the plaintiff. The court has addressed the parties' earlier motions by two separate Orders (Dkt. 93, 131), the factual findings and legal conclusions of which are incorporated herein. The present Order is further issued on an expedited basis to assist in the parties' scheduled mediation of the matter on April 27, 2015. Fuller exploration of the issues involved in the present wave of motions may issue at a later date.

**1. Amount of Damages**

Caravan seeks summary judgment as to the amount of its damages. Specifically, it seeks a determination that the failure of the screen on the sifter required it to recall the flour produced from the sifter. Further, it seeks a determination that it suffered $3,416,901.36 in damages as a result of the recall of the flour. The damages reflect the costs of claims by Caravan's customers, as well as the freight costs to return contaminated flour and to ship re-ordered flour. Additionally, acknowledging AZO's defense which alleges that Caravan should have detected the failure of the wire screen earlier and that its damages should therefore be limited to a recall of the product during the first week of use (January 9 to 16, 2012), Caravan seeks a determination that its damages for that first week are $1,169,388.00. The court set forth the controlling summary judgment standards in its previous Orders.

The facts set forth in Caravan's motion are largely uncontroverted. Indeed, of the 28 paragraphs of uncontroverted fact submitted by plaintiff, AZO explicitly admits 25. Of the remaining three (¶¶ 2, 26, and 28), AZO offers responses to two which fail to effectively controvert the requested finding. Thus, Caravan alleges that the screen fragments located in the flour came from the failed Sefar-AZO screen. AZO denies the requested finding, but the underlying testimony of AZO's own expert acknowledges that "it's more probable than not that the Canada Bread screen fragment came from the destroyed screen."

Caravan alleges that "AZO has not produced any witness, or evidence challenging the damage totals set forth above and in the exhibits attached hereto." AZO's response does not deny this contention. Rather, the defendant "admits that it has not produced any

evidence challenging Caravan's damage totals to date." (Dkt. 137, at 11).

However, AZO does argue that Caravan has overstated the amount of damages for the first week of production (*id.* at 12-16), and that the damages for the first week are $932,305.00. AZO premises this contention based on its own separate assessment of the figures submitted to Caravan in connection with its motion for partial summary judgment on damages. AZO recalculated the amounts due for the costs of claims

Caravan replies to AZO by arguing that AZO's calculations should be rejected because they were not previously disclosed pursuant to FED.R.CIV.PR. 26(a). Further, it argues that AZO's calculations lack foundation. The dispute also has generated both additional motions (Caravan moving to strike AZO's damages calculations, attached as Exhibits A - D to its Reply, and AZO moving for leave to file a surreply) and a direct dispute of fact between counsel.

AZO argues that there is no reason why it should have previously produced separate calculations as to Caravan's first week of damages, since Caravan itself only set forth these calculations in the motion for summary judgment on damages. Caravan states that this is false.

Both parties dispute whether Caravan's Exhibit 12 in support of its motion, a listing of various damages, was tendered to AZO at an earlier date. Caravan has submitted an affidavit stating that the exhibit was "one of the documents physically handed over to counsel for AZO and former Defendant, Sefar ... during the deposition." (Dkt. 143-1, ¶ 5). AZO has submitted an affidavit from one of its attorneys affirmatively stating that the

3

exhibit "was not produced or marked as an exhibit" during the deposition. (Dkt. 141-1, ¶ 3). Counsel further states that the exhibit "was not produced in Caravan's Initial Rule 26 Disclosures, any supplemental Rule 26 Disclosures, any bates-stamped documents produced by Caravan, included in any Caravan exhibit lists, or referenced in the Pre-Trial Order." (Id. at ¶ 4).

The court denies the motion to strike and grants leave to surreply. Although AZO's damages lack separate expert support, they appear to be fairly straightforward reviews of Caravan's own damages calculations. The plaintiff's foundation arguments lack merit, given the fact that the only support for its first week damages in its summary judgment memorandum (Dkt. 123, ¶ 28) is simply a spreadsheet, otherwise entirely lacking in explanation or foundation.

The court need not resolve the direct factual dispute between counsel as to whether Exhibit 12 was physically presented at the deposition. Exhibit 12 is a single-page set of calculations. The document has no formal heading, and could have easily been lost amidst the other paper presented during the course of the deposition. The exhibit could have been tendered to counsel for Sefar and not conveyed to AZO.

Most importantly, there is no indication that Caravan ever formally presented these calculations to AZO *as a statement of its claims for damages* until the motion for summary judgment. The court finds that AZO's recalculations of these figures do not require expert testimony, that the defendant's recalculations are not lacking in foundation, and finds that a material issue of fact exists as to Caravan's damages during the first week of production.

The plaintiff's motion is otherwise granted.

**2. AZO Defense Paragraph 2**

Caravan has moved for summary judgment as to Paragraph 2 of AZO's Comparative Fault Defense, which asserts that Sefar caused the accident by making a defective screen, as well as any claim by AZO that the accident was caused by the screen frame, rather than the screen itself. In its Response, AZO agrees that it will not assert that the screen frame caused the accident. It argues, however, that the existence of a manufacturing defect by Sefar remains in question.

Caravan's motion focuses on the report and deposition testimony of AZO's expert, Stephen Philip Buckley, P.E. The report sets forth sixteen numbered opinions, none of which state that Sefar did anything to cause the screen failure. Nor does the report otherwise state that Sefar did anything to cause the failure. Caravan further notes that in his January 25, 2015, deposition, Buckley explicitly discounted the existence of a manufacturing defect:

> Q. And is it your understanding that it was [Caravan expert] Dr. [Thomas] Eagar's opinion that some of those hardness variations were, perhaps, causative to the screen failure?
>
> A. I got very distinctly that he thought it was causative, but I disagree.
>
> Q. Disagree. Okay. So -- that was my next question. It's your opinion that any variations in the hardness discovered during the testing were not causative to the screen failure, but, rather, were a result of the failure?
>
> A. Exactly.

Further into his deposition, Buckley attributed the failure to overloading, not variation in wire diameter.

> Q. You're not critical of the material Sefar used to make the screen -- the broken screen?
>
> A. I wouldn't agree with that.
>
> Q. Okay. What is your criticism of the material?
>
> A. The material measurements that I made characterized both the broken screen, the used screens — actually, when I say "both," I should say all of the broken, the used, and the new screens. The material dimensions of the diameters of those wires was smaller than I would have expected, based on the manufacturing process. And because they were smaller, I believe that they did not have the characteristics that were stated to be actual measurements of that wire made by the wire manufacturer.
>
> Q. Okay. So I think we can get that a little more specific. I believe the specs for the wire called for a diameter of .0065 inches?
>
> A. That's correct.
>
> Q. And you're saying some of the measurements indicated diameters smaller -- wire diameters smaller than .0065 inches?
>
> A. Yes.
>
> Q. Do you believe those variations in diameter were causative of the failure of the broken screen?
>
> A. I think that they contributed to the failure of the broken screen.
>
> Q. Explain to me how.
>
> A. Causative is an interesting word. Causative -- the mode of failure is what you get from a causative situation. A contributing situation is something that contributed to the cause of failure. In my opinion, the cause of failure was overload. A contributing factor was the wire diameter.

> Q. Assuming the diameters you found existed at the — when the screen was installed in operation, if there had not been an overload, would the screen have failed?
>
> A. I think it's highly unlikely.
>
> Q. So without the overload, but given smaller wire diameters, you think it's more likely than not that the screen would have remained intact?
>
> A. Yes.

Buckley testified that he had no other criticisms of the material Sefar used, other than the variation in wire diameter.

In contrast to Buckley, Caravan's forensic expert on the cause of the screen failure, Dr. Thomas Eagar, has attributed some of the fault for the accident to Sefar. Dr. Eagar wrote in his report:

> 3. It is noted that the lower mesh screen shown in Figure 1 is relatively intact after four weeks of service, while the upper mesh has been destroyed. Based on the microhardness test results from Colorado Metallurgical Services, the upper mesh has vastly higher hardness (strength) on samples CA20 and CA21 than do samples CA1 and CA2 or the broken sample. This higher and highly non-uniform wire strength in the CA20 and CA21 wire supplied by Sefar is the most probable cause of the rapid failure of the upper broken mesh. The steel is much more susceptible to stress corrosion cracking at these higher hardness levels [Exhibit A]. The SEM photographs of samples CA20 and CA21 show much coarser and more distinct fatigue striations than do the fractures of samples CA1 and CA2. See Figures 2 A and B as compared with Figures 2 C and D. The coarser fatigue striations in samples CA20 and CA21 are the most probable cause of the rapid crack growth.

In its motion, Caravan attempts to mitigate this attribution by stressing that Eagar subsequently testified in his deposition that the screen would have failed regardless of the wire diameter variations. (Dkt. 135, at 14).

The court finds that summary judgment should not issue. In the cited passage from his deposition, Dr. Eagar does not directly address his earlier attribution of fault against Sefar. Rather, Dr. Eagar is simply responding to representations by counsel as to a prior Order of this court. Dr. Eagar stresses that counsel "just told me about it," and that he "didn't know that types of details of what was in the motion." (Dep. at 110). Dr. Eagar cautions that because he hasn't read the Order, "I'm not going to opine about the opinion." (*Id*. at 111).

The cited deposition testimony thus does nothing to detract from the thrust of Dr. Eagar's earlier Report — that the manufacturing defect reflected in the inconsistent wire diameter was "the most probable cause of the *rapid failure* of the upper broken mesh." (Emphasis added). The deposition testimony, as it relates to the selection of the screen, is not inconsistent with this result. Dr. Eagar testified that the metal screen would likely fail *eventually*:

> I'll go back to my frequency argument. To fail within forty-eight hours when your inspection — recommended inspection interval is one week, is premature in my opinion. Okay? So there's something else going on here than just — But stainless steel was not going to last for a long time in any case. It wasn't going to be a twenty year product. I don't know that it would be a one year product. But I think a lot of people were surprised at forty-eight hours.

Here the screen indeed failed rapidly, contaminating the very first batch of flour produced. At this stage in the litigation, the court does not weigh the evidence. A rational fact finder could look at Dr. Eagar's opinions and determine that Sefar is partially to blame for this rapid failure.

As a result, the court grants summary judgment as to any contention that a broken screen frame caused the plaintiff's losses. The plaintiff's motion is otherwise denied.

**3. Defendant's Summary Judgment Motion**

The court finds that evidence set forth in earlier summary judgment rulings precludes granting summary judgment in favor of AZO. In particular, the court finds that, given evidence relating to AZO's knowledge of the relative merits of steel and nylon mesh, AZO is not entitled to summary judgment based upon K.S.A. 60-3306.

**4. Exclusion of Defense Expert**

Caravan argues that Stephen Buckley's opinions should be excluded as unreliable because in his deposition he demurred from explicitly describing himself as a qualified metallurgist, a certified expert in change management, or a certified expert in human factors. Caravan also argues that Buckley's opinion that the accident was caused by its overproduction is not admissible because it lacks factual support. Specifically, the plaintiff notes that there is no separate support of Buckley's theory that four feed hoppers were in operation at once, and the majority of evidence indicates that Caravan did not exceed the 16,000 pounds of flour per hour limit for the sifters. Finally, it contends that Buckley has no data to support his opinions that Caravan failed to provide alert and satisfactory oversight, and that no testing supports his conclusion that variations in wire thickness contributed to the screen failure.

The court denies Caravan's motion. Buckley's general training and experience in mechanical engineering and design qualify him to advance the opinions cited in his report. Although Buckley acknowledged in his deposition that he was not "qualified" in metallurgy, and was not "certified" in change management or human factors, these statements in themselves do not require exclusion of his testimony. Buckley otherwise appears to have significant experience in engineering in general, in fracture mechanics, and in metal graphics research. He has extensive experience as a forensic expert, and has testified previously on numerous occasions. Buckley's mechanical engineering experience has also given him the ability to address human factors questions as they relate to mechanical design.

The court similarly rejects the arguments advanced by Caravan as to specific aspects of Buckley's testimony. As the court noted in an earlier Order, the testimony of Caravan's plant manager can be read as indicating that Caravan produced flour at the rate of 18,000 pounds per hour, an amount in excess of the maximum capacity for the sifter. Certainly there is other evidence suggesting a lower rate of production, but the court at this point does not weigh the evidence. A rational fact finder could believe the plant manager's testimony, thereby providing support for Buckley's belief that overproduction contributed to the screen failure. Buckley's opinions as to the screen failure are further supported by his assessment of the capacity of the hopper lines and the testing of a screen at a facility in Colorado.

**5. Exclusion of Plaintiff's Expert**

The court reaches the same result with respect to AZO's motion to exclude the opinion testimony of Caravan's expert, Dr. Eagar as to (1) whether stainless steel was an appropriate material for use in the screen, and (2) that the screen failed due to bad design or integration by AZO. The defendant argues that Dr. Eagar's opinions should be excluded because he failed to perform testing on the subject screen or on a nylon alternative. He also has not reviewed any testing or design documents from AZO.

The court denies the motion to exclude. Dr. Eagar's training and experience are substantial, and his opinions are well-grounded in the evidence, including depositions of AZO employees and documents produced by AZO, as well as recognized texts addressing structural failure and fatigue. Dr. Eagar also had access to testing on the screens following the accident. The court finds that Dr. Eagar may testify pursuant to FED.R.EVID. 702.

IT IS ACCORDINGLY ORDERED this 24th day of April, 2015, that the defendant's Motions for Summary Judgment (Dkt. 126) and to Strike Expert Testimony (Dkt. 132) are denied; defendant's Motion for Leave to File Surreply (Dkt. 141) is granted; plaintiff's Motion for Partial Summary Judgment as to Damages (Dkt. 122) and its Motion for Summary Judgment on Paragraph 2 and Screen Frame Failure (Dkt. 124) are granted in part and denied in part as provided herein; plaintiff's Motion to Strike Expert Testimony (Dkt. 129) and Motion to Strike Exhibits A through D (Dkt. 142) are denied.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE